IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | | |
|---|---|---|
| STEVEN LEON HILL, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 1:14cv1261 (JFA) |
| | ) | |
| CAROLYN W. COLVIN, | ) | |
| Acting Commissioner, | ) | |
| Social Security Administration, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## MEMORANDUM OPINION

This matter is before the court on cross-motions for summary judgment. (Docket nos. 8, 13).[1] Pursuant to 42 U.S.C. § 405(g), plaintiff seeks judicial review of the final decision of Carolyn W. Colvin, Acting Commissioner of the Social Security Administration ("Commissioner"), finding that plaintiff was no longer disabled and therefore not entitled to continued Disability Insurance Benefits ("DIB") pursuant to Title II of the Social Security Act.

Plaintiff was originally found to be disabled on December 21, 2009.[2] (AR 13, 54). This determination was based on a finding that the plaintiff's impairments as of May 15, 2009 met or medically equaled the severity of Listing 6.02B, which affords the claimant a presumption of disability for twelve months following kidney transplantation. *See* 20 C.F.R. § 404, Subpart P, App. 1. After twelve months, Listing 6.02B calls for a residual impairment evaluation pursuant to Listing 6.00E2, considering the following factors: occurrence of rejection episodes; side

---

[1] The Administrative Record ("AR") in this case has been filed under seal, pursuant to Local Civil Rules 5 and 7(C). (Docket no. 5). In accordance with these rules, this opinion excludes any personal identifiers such as plaintiff's social security number and date of birth (except for the year of birth) and the discussion of plaintiff's medical information is limited to the extent necessary to analyze the case.

[2] As the most recent favorable medical decision finding that the plaintiff was disabled, this decision is referred to as the "comparison point decision."

effects of immunosuppresents, including corticosteroids; frequency of any renal infections; and presence of systemic complications such as other infections, neuropathy, or deterioration of other organ systems. On June 26, 2012, the Social Security Administration issued a "Notice of Disability Cessation" after determining that plaintiff's health had improved and his impairments no longer qualified him for DIB. (AR 56–58). Plaintiff's request for reconsideration before a state agency Disability Hearing Officer ("DHO") was denied following a hearing on October 4, 2012. (AR 77–85). Thereafter, plaintiff requested a hearing before an Administrative Law Judge ("ALJ"). (AR 89). The Commissioner's final decision is based on a finding by the ALJ and Appeals Council for the Office of Disability Adjudication and Review ("Appeals Council") that plaintiff was not disabled as defined by the Social Security Act and applicable regulations.

Both parties filed motions for summary judgment (Docket nos. 8, 13), along with briefs in support (Docket nos. 9, 14), which are now ready for resolution. The court has also considered plaintiff's reply (Docket no. 19) as well as the arguments presented by counsel at the hearing on Friday, February 27, 2015. For the reasons set forth below, plaintiff's motion for summary judgment (Docket no. 8) will be denied; the Commissioner's motion for summary judgment (Docket no. 13) will be granted; and the Commissioner's final decision will be affirmed.

## I. PROCEDURAL BACKGROUND

Plaintiff filed his application for DIB on September 3, 2009, alleging a disability onset date of May 15, 2009. (AR 128). On December 21, 2009, plaintiff was found to be disabled under Listing 6.02B after the Social Security Administration determined that plaintiff had undergone a combined kidney and pancreas transplant in May 2009. (AR 54, 511–12). As a result, plaintiff was allowed benefits effective May 15, 2009. (AR 54).

2

In June 2012, the Social Security Administration determined that a follow-up medical evaluation was needed, given that medical improvement was expected. (AR 50). On June 26, 2012, the Social Security Administration found that plaintiff was able to engage in substantial gainful activity and was no longer disabled as of June 1, 2012. (AR 56–58). In reaching this decision, the Social Security Administration considered updated medical records and also relied on a finding by the Disability Determination Service that plaintiff "has the residual functional capacity to perform sedentary work which means to sit and work at least 6 out of 8 hours and lift up to 10 pounds." (AR 50).

On October 4, 2012, a hearing was held before a state agency DHO in order to determine "whether the claimant is disabled/blind under the definition of disability/blindness contained in Section 223(d) and Section 1614(a) of the Social Security Act, taking into account, when applicable, the standard of review for termination of disability benefits contained in Section 223(f) and Section 1614(a)(5) of the Social Security Act." (AR 77). The Social Security Administration issued a Notice of Reconsideration on November 13, 2012 along with the hearing decision of the DHO. (AR 86–88). In finding substantial medical improvement since the comparison point decision, the DHO concluded that plaintiff had the ability to perform substantial work in a seated position and no longer met the requirements for disability. (AR 77–85). The Notice of Reconsideration also set forth the appeals process and stated that plaintiff had the right to appeal the decision to an ALJ within 60 days. (AR 86–87).

Plaintiff submitted his request for a hearing before an ALJ on November 20, 2012 (AR 89) and a hearing was held on April 18, 2013 in Charlottesville, Virginia (AR 13, 30–49). On May 3, 2013, the ALJ issued a decision, finding that plaintiff's disability under sections 216(i) and 223(f) of the Social Security Act ended as of June 1, 2012 and that plaintiff was capable of

making a successful adjustment to work that existed in significant numbers in the national economy. (AR 13–23).

On June 26, 2013, plaintiff requested review of the ALJ's decision, claiming that the ALJ failed to establish that his condition improved to the point where he was no longer disabled. (AR 8). Plaintiff's counsel also submitted a letter in support of the appeal (AR 212–15), although plaintiff was not represented by counsel at the hearing before the ALJ (AR 32). The Appeals Council denied plaintiff's request for review on August 27, 2014. (AR 1–3). As a result of this denial, the ALJ's decision became the final decision of the Commissioner.

On September 24, 2014, plaintiff filed this action seeking judicial review of the Commissioner's final decision pursuant to 42 U.S.C. § 405(g). (Docket no. 1). On February 5, 2015, an order of referral was entered following the parties' joint consent to the jurisdiction by U.S. Magistrate Judge. (Docket nos. 17, 18). This case is now before the court on the parties' cross-motions for summary judgment. (Docket nos. 8, 13).

## II. STANDARD OF REVIEW

Under the Social Security Act, the court's review of the Commissioner's final decision is limited to determining whether the Commissioner's decision was supported by substantial evidence in the record and whether the correct legal standard was applied in evaluating the evidence. *See* 42 U.S.C. § 405(g); *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Hays*, 907 F.2d at 1456 (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). While the standard is high, where the ALJ's determination is not supported by substantial evidence on the record, or where the ALJ has made an error of law, the

4

district court must reverse the decision. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

In determining whether the Commissioner's decision is supported by substantial evidence, the court must examine the record as a whole, but it may not "undertake to re-weigh the conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the Secretary." *Mastro v. Apfel*, 270 F.3d 171, 176 (4th Cir. 2001) (alteration in original) (citing *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996)). The Commissioner's findings as to any fact, if the findings are supported by substantial evidence, are conclusive and must be affirmed. *See Perales*, 402 U.S. at 390. The Commissioner is also charged with evaluating the medical evidence and assessing symptoms, signs, and medical findings to determine the functional capacity of the claimant. *See Hays*, 907 F.2d at 1456–57. Overall, if the Commissioner's resolution of conflicting evidence is supported by substantial evidence, the district court is to affirm the Commissioner's final decision. *See Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966).

## III. FACTUAL BACKGROUND

### A. Plaintiff's Age, Education, and Employment History

Plaintiff was born in 1971 and was forty-two years old at the time of the ALJ's decision. (AR 34). Plaintiff completed the twelfth grade and graduated from high school in 1989. (AR 35, 44). After high school, plaintiff worked at a grocery store. (AR 478). Plaintiff later enrolled in technical school to become an electrician and worked as a residential electrician for approximately 17 years. (AR 35, 51). In a disability report dated September 9, 2009, plaintiff alleged a disability onset date of May 15, 2009, but claimed that he stopped working prior this

date after being terminated for reasons unrelated to his condition. (AR 150, 179). At the hearing before the ALJ, plaintiff claimed that his last day of work occurred in February 2009. (AR 35).

### B. Summary of Plaintiff's Medical History[3]

As noted in and demonstrated by plaintiff's voluminous medical records, plaintiff "has a very complicated past medical history." (AR 895). Plaintiff was diagnosed with diabetes at age 15 and began treating his diabetes with insulin at the age of 16. (AR 1065). Plaintiff began seeing a nephrologist in April 2007. (AR 152). Records obtained from plaintiff's nephrologist indicate that plaintiff began Procrit injections in January 2008. (AR 472). By March 2008, lab tests confirmed that plaintiff was suffering from a progressive kidney disease. (AR 248, 475–76). A social work assessment conducted on April 9, 2008 indicates that plaintiff was diagnosed with end stage renal disease and was contemplating a kidney transplant. (AR 477). At the time of this assessment, plaintiff was working as an electrician. (AR 478, 481).

On May 12, 2008, plaintiff met with Dr. James Piper for a kidney and pancreas transplant evaluation. (AR 248). Records indicate that plaintiff was suffering from diabetic nephropathy and was rapidly approaching end stage renal disease, which made him an "excellent candidate" for a kidney and pancreas transplant. (AR 248–49). Plaintiff's physical exam was unremarkable. (AR 248). Following the cardiologic evaluation and clearance procedures, Dr. Joseph Kiernan noted that plaintiff "is still able to walk up 3-4 flights of stairs before having to stop and rest. He is still employed as a full-time electrician. He believes he can walk an indefinite distance on level ground without difficulty." (AR 466).

Plaintiff underwent a kidney and pancreas transplant on May 14, 2009. (AR 484). The procedure was performed without serious complications. (AR 484–85). However, on June 7,

---

[3] The Administrative Record contains nearly 1000 pages of medical records from various sources. This summary provides an overview of plaintiff's medical treatments and conditions relevant to his disability claim and is not intended to be an exhaustive list of each and every medical treatment.

2009 a CT scan of plaintiff's abdomen and pelvis revealed a large loculated fluid collection on the right side of the abdomen. (AR 492). Plaintiff underwent a CT-guided drainage procedure and reported significant improvement thereafter. (*Id.*). A follow up CT scan of plaintiff's abdomen on June 12, 2009 showed significant decrease in the right abdominal abscess collection and mild prominence of the collecting system of the transplanted kidney. (*Id.*). Plaintiff was determined to be stable and was discharged on June 15, 2009, with instructions to follow up at the transplant center and interventional radiology for a drain tube check. (*Id.*).

On July 7, 2009, plaintiff returned to the hospital for an abdominal abscess catheter check. (AR 258). The procedure was successful and plaintiff was directed to return in ten days for another tube check and possible change. (AR 259). Due to continuing complications, plaintiff underwent an exploratory laparotomy on July 10, 2009.[4] (AR 482–83). During this procedure, part of the pancreas was determined to be infected and was excised. (AR 483). Afterwards, plaintiff was transferred to the postoperative floor where he suffered a seizure. (AR 488). Plaintiff's discharge summary notes that the seizure was thought to be due to the multiple medications that were given to plaintiff in order to address his rising creatinine levels. (*Id.*). Plaintiff was transferred to the intensive care unit ("ICU") where he suffered two subsequent seizures, developed significant acidosis, respiratory failure, and acute mental status changes. (*Id.*). On July 11, 2009, plaintiff underwent a CT scan of his chest, abdomen, and pelvis to identify the source of acidosis and was found to have a left upper lobe segmental and subsegmental pulmonary embolism, as well as postsurgical changes in the pelvis with a small loculated collection in the right lower quadrant. (*Id.*).

---

[4] The full procedure included the following: "Exploratory laparotomy with lysis of adhesions and distal pancreatectomy of transplanted pancreas and appendectomy, as well as open renal biopsy of renal allograft." (AR 579).

On July 12, 2009, plaintiff underwent a CT-guided drainage procedure with re-extension of the right external iliac drain, as well as placement of a transplant percutaneous nephrostomy catheter. (AR 489). Both the CT scan and MRI of plaintiff's brain were unremarkable. (*Id.*). On July 14, 2009, patient was transferred out of the ICU and reported that his pain was well controlled. (*Id.*). The interventional radiology team recommended evaluation of plaintiff's percutaneous nephrostomy tube following epithelialization of the tract. (*Id.*). On July 18, 2009, plaintiff experienced increased swelling in his right lower extremity. (*Id.*). Another CT scan of the abdomen and pelvis on July 19, 2009, revealed re-accumulation of fluid on the right pelvic sidewall as well as two collections in the anterior abdomen surrounding the transplanted pancreas. (*Id.*). It was later determined that percutaneous aspiration of the right pelvic sidewall was unnecessary and that the intra-abdominal abscesses would only be drained in the event plaintiff became symptomatic. (*Id.*). Plaintiff was discharged on July 22, 2009, after it was determined that he was tolerating a regular diet and his pain was well controlled. (*Id.*).

On June 1, 2011, plaintiff fell down a small flight of stairs and sustained a fracture in his left leg. (AR 925). Thereafter, plaintiff arrived at Fauquier Hospital and was admitted to the emergency room. (AR 895). An x-ray taken on June 2, 2011 revealed a comminuted fracture involving the proximal tibia and fibula. (AR 839). The radiology report also notes the presence of osteoporosis, joint effusion, and vascular calcifications posteriorly, medially, and laterally. (*Id.*). On June 3, 2011, plaintiff underwent an Open Reduction and Internal Fixation in order to repair the tibial plateau fracture. (AR 895–97). Plaintiff's joint was repaired with a bone graft and then reinforced with a proximal tibial locking plate, which was laid across the fracture site and secured with locking screws. (AR 896). The procedure was performed without complications. Plaintiff was discharged from Fauquier Hospital on June 9, 2011. (AR 923).

On June 14, 2011, plaintiff attended a post-operative checkup at the Blue Ridge Orthopaedic & Spine Center. (AR 851). At this time, plaintiff complained of peroneal nerve palsy with numbness and tingling on the dorsum of his foot and the inability to extend his ankle and big toe. (*Id.*). Plaintiff's orthopedist took x-rays of the left knee and noted that the fracture was well-aligned and there was no evidence of loosening, migration or failure. (*Id.*). Plaintiff was directed to physical therapy in order to address his limited range of motion and foot drop. (*Id.*). Plaintiff eventually developed an MCL tear, which was also addressed and resolved with physical therapy. (AR 859–65).

On July 6, 2011, plaintiff was admitted to Fauquier Hospital after experiencing a fever, abdominal pain, and hematuria. (AR 902). Prior to his admission, plaintiff's nephrologist ordered an outpatient urinalysis and renal ultrasound. (*Id.*). On July 7, 2011, the urinalysis results confirmed that plaintiff had an infection and kidney stones. (AR 905). Thereafter, plaintiff was transferred to Inova Fairfax Hospital for care by the transplant and urology services. (*Id.*).

In July 2011, plaintiff underwent a percutaneous lithotomy with antegrade nephrostogram, an antegrade cystoscopy, and stent change on the transplanted kidney. (AR 624). After plaintiff's left transplant ureteric stent was removed on July 26, 2011, plaintiff developed transplant kidney nephrolithiasis. (AR 624, 602). On August 17, 2011, plaintiff presented for the removal of his nephrostomy tube. (AR 609). However, after an examination revealed kidney stones and severe hydronephrosia, the nephrostomy catheter was left in place. (AR 609–10). On September 21, 2011, plaintiff underwent a transplant nephrostogram, balloon dilation of his transplant ureter for stricture, and placement of a nephroureteral stent.[5] (AR 582,

---

[5] Plaintiff's medical records are unclear with respect to when the nephroureteral stent was removed, but more recent medical records suggest it is no longer in place. (AR 1248).

598). Shortly thereafter, plaintiff began to suffer from high fevers, nausea, and vomiting. (AR 582). Plaintiff was admitted to the hospital on September 24, 2011. (*Id.*). A physical examination, chest x-ray, and ultrasound of the transplanted kidney were unremarkable. (AR 582–83). Additional tests revealed an elevated white blood cell count and elevated velocities in the mid portion of plaintiff's renal artery. (*Id.*).

Plaintiff began physical therapy at Fauquier Hospital in September 2011.[6] (AR 947). Plaintiff was referred to Erin K. Parrill on August 23, 2011 with a diagnosis of plateau fracture and peroneal nerve palsy for aquatic physical therapy evaluation and treatment. (*Id.*). Over the course of 28 individual visits, plaintiff's pain level, range of motion, and ambulatory ability greatly improved. (AR 963–68, 987–91). At the time of plaintiff's discharge on February 20, 2012, plaintiff had progressed from bilateral auxiliary crutches to a single point cane, was able to negotiate stairs with the cane and no handrail, and was able to ambulate more than 200 feet without a device. (AR 982). At discharge, no swelling was noted. (AR 983).

Plaintiff has also suffered complications with his vision. At the hearing before the ALJ, plaintiff testified that his vision began to deteriorate during the time he was admitted to the hospital for an exploratory laparotomy on July 10, 2010. (AR 37). On August 8, 2012, plaintiff underwent a physical examination and denied blurred vision, eye disease, visual changes, and altered vision, but noted retinopathy in the right eye. (AR 1036–38). Approximately two weeks later, Dr. Glen Monteiro conducted a consultative examination on August 23, 2012. (AR 1058). During this examination, the vision in plaintiff's left eye was reported as 20/40 but he was unable to see the examiner's hand from six feet away with his right eye. (AR 1059). Medical records indicate that plaintiff's deteriorating vision was the result of diabetic retinopathy, which

---

[6] Plaintiff had previously been completing a physical therapy program at Blue Ridge Orthopaedic & Spine Center, but was discharged from that facility because his health insurance would no longer cover the payments. (AR 948).

later progressed to end stage neovascular glaucoma in the right eye. (AR 731, 734). Over the course of several months, plaintiff received injections in both his left and right eyes in order to control the diabetic retinopathy. (AR 734). Plaintiff also treated both eyes with prescription eye drops. (AR 755–56). In early 2010, plaintiff received laser treatment on his left eye in order to stabilize the proliferative diabetic retinopathy, which appeared to be successful. (AR 734). Plaintiff continued to receive injections in his left eye, although records indicate he contemplated stopping this treatment at one point. (AR 695).

### C. ALJ's Decision dated May 3, 2013

When determining whether a claimant—who was previous determined to be disabled—continues to be disabled under applicable regulations, the ALJ is required to apply an eight-step sequential evaluation process. *See* 20 C.F.R. § 404.1594. It is this process the district court must examine on appeal in order to determine whether the correct legal standards were applied and whether the resulting decision of the Commissioner is supported by substantial evidence in the record. *See* 20 C.F.R. § 404.1520.

In determining whether a claimant's disability continues, the ALJ applies the following sequential evaluation: (1) if the claimant is currently engaging in substantial gainful activity, disability ends; (2) if the claimant has an impairment or combination of impairments that meets or medically equals a listing, disability continues; (3) if the claimant does not meet or equal a listing, the ALJ will determine whether "medical improvement" has occurred; (4) if medical improvement has occurred, the ALJ will determine whether the improvement is related to the claimant's ability to work; (5) if there is no medical improvement—or the medical improvement is found to be unrelated to the claimant's ability to work—disability continues; (6) if there has been medical improvement related to the claimant's ability to work, the ALJ will determine

11

whether all of the current impairments, in combination, are "severe," and if not, disability ends; (7) if the claimant's impairments are considered "severe," the ALJ will determine the claimant's residual functional capacity, and if the claimant is able to perform past relevant work, disability ends; (8) if the claimant remains unable to perform past relevant work, the ALJ will determine whether the claimant can perform other work that exists in the national economy given his or her residual functional capacity, age, education, and past relevant work experience. *See* 20 C.F.R. § 404.1594(f)(1)–(8).

If a claimant can perform other jobs that exist in the national economy he is no longer considered to be disabled, but if a claimant cannot perform other work, his disability continues. Although a claimant generally continues to have the burden of proving disability at this final step, a limited burden of going forward with evidence shifts to the Social Security Administration. Thus, in order to support a finding that a claimant is no longer disabled, the Social Security Administration is responsible for providing evidence that demonstrates that other work exists in significant numbers in the national economy that a claimant could perform, given his residual functional capacity, age, education, and past relevant work experience. *See* 20 C.F.R. § 404.1520.

On May 3, 2013, the ALJ determined that the plaintiff's disability under sections 216(i) and 223(f) of the Social Security Act ended as of June 1, 2012. (AR 22). In reaching that decision, the ALJ made the following findings of fact:

(1) The most recent favorable medical decision finding that the claimant was disabled is the determination dated December 21, 2009 (the "comparison point decision");

(2) At the time of the comparison point decision, the claimant had the following medically determinable impairments: chronic renal failure, status post a May 2009 renal/pancreatic transplant, and diabetes mellitus—and these impairments were found to meet section 6.02(B) of 20 C.F.R. § 404, Subpart P, App. 1;

12

(3)  Through June 1, 2012, the claimant did not engage in substantial gainful activity;

(4)  The medical evidence establishes that, as of June 1, 2012, the claimant had the following medically determinable impairments: chronic renal failure, status a post May 2009 renal/pancreatic transplant, diabetes mellitus, diabetic retinopathy, and status a post left tibial plateau fracture requiring internal fixation and left MCL injury;

(5)  Since June 1, 2012, the claimant did not have an impairment or combination of impairments which met or medically equaled the severity of an impairment listed in 20 C.F.R. § 404, Subpart P, App. 1;

(6)  Medical improvement occurred as of June 1, 2012;

(7)  The medical improvement is related to the claimant's ability to work because, as of June 1, 2012, the claimant's impairments as set forth in the determination dated December 21, 2009 no longer met or medically equaled the same listing that was met at the time of the comparison point decision;

(8)  As of June 1, 2012, the claimant continued to have a severe impairment or combination of impairments;

(9)  Based on the impairments present as of June 1, 2012, the claimant has the residual functional capacity to perform sedentary work, except that he is limited to lifting and carrying 20 pounds occasionally and 10 pounds frequently, standing and walking for less than or equal to 4 hours in an 8 hour day with normal breaks, sitting for less than or equal to 6 hours in an 8 hour day with normal breaks and frequent stooping, crouching and bending—in addition, due to claimant's history of severely compromised visual acuity on the right side, tasks involving fine visual acuity should be restricted and claimant would benefit from the use of a single point cane for additional balance and support especially during flare-ups of his chronic lower extremity edema or pain;

(10)  As of June 1, 2012, the claimant was unable to perform past relevant work;

(11)  On June 1, 2012, the claimant was a younger individual age 18–44;

(12)  The claimant has at least a high school education and is able to communicate in English;

(13)  Beginning on June 1, 2012, transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills; and

(14)  As of June 1, 2012, considering the claimant's age, education, work experience, and residual functional capacity based on the impairments present as of June 1, 2012, the claimant was able to perform a significant number of jobs in the national economy.

13

Central to the ALJ's decision was the finding that although plaintiff's medically determinable impairments could have reasonably been expected to produce the alleged symptoms, the plaintiff's statements concerning the intensity, persistence, and limiting effects of these symptoms were not credible to the extent they remained inconsistent with the residual functional capacity assessment that would allow plaintiff to perform sedentary work. (AR 19). Plaintiff now challenges the Commissioner's final decision, arguing that the ALJ improperly discounted the opinion of plaintiff's treating nephrologist and improperly assessed the credibility of plaintiff's reported chronic pain and nausea. (Docket no. 9 at 7–9). Based on these deficiencies, plaintiff claims the ALJ erred in concluding that the plaintiff has the residual functional capacity to perform sedentary work. (*Id.* at 5–7). In the reply, plaintiff raises for the first time the specific argument that the ALJ failed to follow the steps set forth in Listing 6.00E2 in making his decision.

## IV. ANALYSIS

### A. Overview

In the complaint filed on September 24, 2014, plaintiff challenges the Commissioner's final decision and requests judicial review pursuant to 42 U.S.C. § 405(g). (Docket no. 1). Plaintiff later clarified this position in his motion for summary judgment (Docket no. 8) and accompanying memorandum in support (Docket no. 9), arguing that the ALJ erred in concluding that: (i) based on the impairments existing as of June 1, 2012, plaintiff had the residual functional capacity to perform limited sedentary work; and (ii) plaintiff's statements concerning the intensity, persistence, and limited effects of his symptoms were not fully credible. In the reply, plaintiff raises the argument that the evaluation factors set forth in Listing 6.00E2 were not used in making the continuing disability evaluation.

14

The issue before this court is whether there is substantial evidence in the record to support the Commissioner's final decision that plaintiff experienced medical improvement, such that he was no longer disabled after June 1, 2012, and whether the Commissioner—acting through the ALJ—applied the correct legal standards in reaching that decision.

## B. The ALJ's Residual Functional Capacity Assessment is Supported by Substantial Evidence

Plaintiff argues that the ALJ erroneously concluded that he has the residual functional capacity to perform a limited amount of sedentary work. (Docket no. 9 at 5). The Social Security regulations define "sedentary work" as work that "involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools." 20 C.F.R. § 404.1567(a). The regulations also state that while a sedentary job is one that involves sitting, "a certain amount of walking and standing is often necessary in carrying out job duties." *Id.* Plaintiff alleges that in reaching this conclusion, the ALJ improperly discounted the opinion of plaintiff's nephrologist, Dr. Chander, who provided assessments that supported a finding of continuing disability. (Docket no. 9 at 5). Based on the reasons set forth below, the court finds that the ALJ's determination that medical improvement occurred and that plaintiff was able to perform a limited amount of sedentary work after June 1, 2012 is supported by substantial evidence.

When determining a claimant's residual functional capacity, the ALJ must consider all impairments supported by the objective medical evidence in the record as well as those impairments based on the claimant's credible complaints. *See* 20 C.F.R. § 404.1545. In finding that plaintiff was capable of performing a limited amount of sedentary work, the ALJ weighed and considered a variety of medical evidence and testimony, including: assessments provided by two state agency experts (AR 1017–24; AR 1071–78); an examination conducted by a medical

15

consultant at the Virginia Department of Rehabilitative Services (AR 1058–63); reports

generated by plaintiff's orthopedic physician (AR 849, 851, 855–56, 859–66, 1003–08; 1010–

12); treatment notes prepared by a physical therapist (AR 937–68; 982–91); reports generated by

plaintiff's nephrologist following office visits (AR 1080–102; 1189–92); blood and urine tests

conducted by plaintiff's nephrologist (AR 1106–56); letters provided by plaintiff's nephrologist

recommending that plaintiff remain eligible for disability benefits (AR 1160, 1253–54); eye

examinations and treatment reports (AR 677–836); and plaintiff's subjective assessment of his

symptoms and limitations (AR 34–43).

In an examination conducted on August 25, 2012, Dr. Monteiro, a medical consultant for

the Virginia Department of Rehabilitative Services, found that plaintiff could stand/walk for 4

hours per workday; sit for 6 hours per workday; lift/carry 20 pounds occasionally and less than

10 pounds frequently; might have some limitations to frequent stooping, crouching, or bending;

and recommended that tasks involving fine visual acuity be restricted.  (AR 1061).  Dr. Monteiro

also stated that plaintiff would benefit from the use of a single-point cane for additional balance

and support, especially during a flare-up of chronic lower extremity edema or pain.  (*Id.*).  In

determining that plaintiff was capable of performing sedentary work, the ALJ incorporated these

recommended limitations into plaintiff's residual functional capacity assessment and noted that

Dr. Monteiro's findings were consistent with the longitudinal record.  (AR 20).  The ALJ also

considered the findings of plaintiff's nephrologist, Dr. Chander.  (*Id.*).  An assessment conduct

by Dr. Chander on August 16, 2012, notes the presence of edema in plaintiff's left leg (AR 1098)

and lab tests beginning on February 16, 2011 and ending on September 19, 2012, also reveal

creatinine levels above the normal range.  (AR 1106–56).  Lastly, two letters written by Dr.

Chander recommend that plaintiff be considered eligible for disability due to "significant

medical conditions that severely impair daily activities for living." (AR 1160, 1253–54). In the letter dated September 21, 2012, Dr. Chander also expressed an opinion as to plaintiff's functional limitations, stating: "Due to his vision loss and severe complicated leg fracture, [patient] has moderate to severe impaired mobility." (AR 1160).

Plaintiff argues that the ALJ erred in disregarding Dr. Chander's opinions concerning his impaired mobility and overall condition. Specifically, plaintiff argues that the ALJ was required to consider and defer to Dr. Chander's opinion under the "Attending Physician's Rule." (Docket no. 9 at 7). In response, the Commissioner correctly argues that "[a] treating physician's opinion is not automatically entitled to great or controlling weight." (Docket no. 16 at 19). *See* 20 C.F.R. § 404.1527(c)(2) (the Commissioner evaluates every medical opinion received and only affords a treating source's opinion controlling weight if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in [the] case record"). Rather, "[a]n 'ALJ' may choose to give less weight to the testimony of a treating physician if there is persuasive contradictory evidence." *Hines v. Barnhart*, 453 F.3d 559, 563 n.2 (4th Cir. 2006).

The court finds that the ALJ applied the proper legal standard in deciding to give less weight to the opinions expressed by Dr. Chander based on conflicts with other evidence in the administrative record. *See* 20 C.F.R. § 404.1527(c)(4) ("Generally, the more consistent an opinion is with the record as a whole, the more weight we will give to that opinion."). While the Fourth Circuit has expressed some level of deference to a treating physician's diagnosis and opinion, the ALJ is not required to accept a medical opinion that is inconsistent with the weight of other evidence presented in the administrative record. *See, e.g., Bostic v. Astrue*, 474 F. App'x 952, 953 (4th Cir. 2012) (affirming rejection of "conclusory determination of disability

[that] was not supported by evidence in the record, nor was it explained by reference to any medical condition or by citation to any medical evidence").

Despite creatinine levels that measured above the normal range, Dr. Chander's own medical records demonstrate that plaintiff had stable renal functioning as of June 1, 2012. (AR 1091, 1094, 1097, 1100). By November 29, 2012, an ultrasound of plaintiff's abdomen and renal artery revealed "normal arterial flow noted without evidence of renal artery stenosis." (AR 1194). In assessing plaintiff's residual functional capacity, the ALJ accounted for that fact that plaintiff's creatinine levels were "elevated," but noted that they were only slightly above the recommended range. (AR 16). The opinions rendered by Dr. Chander are also troublesome in that plaintiff's "vision loss and severe complicated leg fracture" were not addressed by Dr. Chander in her practice as a nephrologist. Rather, plaintiff's orthopedist and physical therapist oversaw treatment following the tibial plateau fracture and subsequent MCL tear.[7] Similarly, plaintiff's diabetic retinopathy was not treated by Dr. Chander and medical records indicate that although plaintiff was completely blind in his right eye, as of November 2012, plaintiff had vision of 20/40 in his left eye and reported that his vision was "pretty good, not bad." (AR 678, 1181).

Based on the foregoing, the court finds that the ALJ properly considered and discussed the clinical findings submitted by plaintiff's care providers, the opinions of medical consultants, as well as plaintiff's own subjective evaluation of his symptoms. The ALJ properly weighed these opinions—some of which conflicted with other evidence in the administrative record—in determining that the plaintiff was capable of performing a limited amount of sedentary work.

---

[7] In June 2012, plaintiff's orthopedist noted "significant swelling" as to plaintiff's left ankle but also noted that plaintiff's range of motion with his knee was excellent and did not recommend any restrictions on plaintiff's activities at that time, provided that plaintiff wore compression stockings to minimize swelling. (AR 1010). The Administrative Record also contains numerous references to findings of no swelling or edema at various times.

Accordingly, the court finds that the ALJ's assessment of plaintiff's residual functional capacity is supported by substantial evidence.

### C. The ALJ's Credibility Determinations are Supported by Substantial Evidence

Plaintiff also argues that the ALJ erred in concluding that his statements concerning the intensity, persistence, and limiting effects of his symptoms were not fully credible. (Docket no. 9 at 7). Specifically, plaintiff alleges that the ALJ failed to properly assess the effect of his chronic pain and nausea. (*Id.* at 9). The Commissioner maintains that substantial evidence supports the ALJ's credibility analysis, arguing that the ALJ fully considered plaintiff's testimony regarding his symptoms and the limiting effects of those symptoms before rendering his decision. (Docket no. 14 at 21). Based on the reasons set forth below, the court finds that the ALJ properly considered plaintiff's chronic pain and nausea along with other findings and opinions in the administrative record.

When evaluating the intensity and persistence of a claimant's symptoms and the effect of those symptoms on a claimant's ability to engage in gainful activity, the ALJ may consider a claimant's treatment, other than medication, a claimant's daily activities, prior work record, and a claimant's own statements about his or her symptoms. *See* 20 C.F.R. § 404.1545; *see also Johnson v. Barnhart*, 434 F.3d 650, 658 (4th Cir. 2005). This court must give great deference to the ALJ's credibility determinations. *See Eldeco, Inc. v. NLRB*, 132 F.3d 1007, 1011 (4th Cir. 1997). The Fourth Circuit has determined that "[w]hen factual findings rest upon credibility determinations, they should be accepted by the reviewing court absent 'exceptional circumstances.'" *Id.* (quoting *NLRB v. Air Prods. & Chems., Inc.*, 717 F.2d 141, 145 (4th Cir. 1983)). Therefore, this court is bound to accept the ALJ's credibility determinations unless they are "unreasonable, contradict[] other findings of fact, or [are] based on an inadequate reason or

no reason at all." *Id.* (quoting *NLRB v. McCullough Envtl. Servs., Inc.*, 5 F.3d 923, 928 (5th Cir. 1993)).

After considering all relevant evidence, the ALJ found that while the plaintiff's medically determinable impairments could have reasonably been expected to produce the alleged symptoms, "the claimant's statements concerning the intensity, persistence and limiting effect of these symptoms are not credible to the extent they are inconsistent with the residual functional capacity assessment." (AR 19). In arriving at this conclusion, the ALJ did not find that plaintiff experienced medical improvement such that he no longer experienced any impairments or functional limitations; rather, the ALJ accounted for plaintiff's existing impairments and found that plaintiff was capable of performing a limited amount of sedentary work.[8] (AR 16).

Plaintiff argues that his statements concerning pain and nausea are consistent with the medical signs and findings of his treating sources: "including, but not limited to, renal & pancreas transplant, kidney stones, kidney, swelling, urinary tract infections fractured leg with internal fixaters, MCL injury, swollen joints, blindness, retinopathy, side effects of medication" and that persistent attempts to obtain relief from pain are evidenced by "increasing medication, trials of a variety of treatment modalities in an attempt to find one that works, referrals to specialists and changing treatment sources." (Docket no. 9 at 8–9). However, medicals records considered by the ALJ reveal that since June 1, 2012, plaintiff's renal function was under control, with no abnormalities in the transplanted kidney and no evidence of renal artery stenosis. (AR 1094, 1097, 1100, 1192). Medical records also reveal that as of January 2012, plaintiff

---

[8] In determining plaintiff's residual functional capacity, the ALJ explicitly accounted for the limitations establish by the record and crafted his assessment accordingly, limiting plaintiff to "lifting and carrying 20 pounds occasionally and 10 pounds frequently, standing and walking for less than or equal to 4 hours in an 8 hour day with normal breaks, sitting for less than or equal to 6 hours in an 8 hour day with normal breaks" and recommending that "tasks involving fine visual acuity should be restricted and he would benefit from the use of a single point cane for additional balance and support especially during flare-ups of his chronic lower extremity edema or pain." (AR 16).

reported that vision in his left-eye seemed to be stabilizing as a result of treatment and that his vision in that eye was "pretty good, not bad." (AR 678). The ALJ then specifically accounted for the loss of vision in plaintiff's right eye, recommending that "tasks involving fine visual acuity should be restricted." (AR 16). Additionally, despite reports of edema in plaintiff's left leg, by June 2012 plaintiff had regained full range of motion in his left knee and had a well-healed MCL. (AR 856, 859, 982–83, 1007, 1010, 1055).

Lastly, the ALJ considered plaintiff's own testimony as to his daily routine, limited mobility, and subjective pain assessment. (AR 17). While plaintiff's testimony indicates some restricted mobility and pain associated with ordinary tasks, it also reveals that plaintiff is capable of personal care, some cooking and cleaning, reading, watching television, walking for approximately twenty or twenty-five minutes, and lifting around 15 pounds. (AR 37–43). Furthermore, plaintiff testified that he owned his own vehicle, which was his principal means of transportation, and that there were no limitations on his driver's license.[9] (AR 34–35).

The court finds that the ALJ properly considered plaintiff's testimony regarding his alleged symptoms and limitations alongside relevant medical records and the documented opinions of various care providers and medical consultants. The ALJ's decision demonstrates that plaintiff's testimony was considered and evaluated in conjunction with other relevant medical evidence. While there were conflicting pieces of evidence, the ALJ applied the proper standard in reviewing the evidence, assessing its credibility, and reaching a decision. Accordingly, this court finds that substantial evidence supports the ALJ's credibility determinations.

---

[9] There are references in the Administrative Record that indicate plaintiff restricts his driving to daylight hours. *See*, (AR 1067).

**D. The ALJ Was Not Required to Specifically Address the Factors in Listing 6.00E2**

Plaintiff's reply raises one argument of first impression in support of his overarching position that the ALJ erred in determining that he experienced medical improvement and was capable of performing a limited amount of sedentary work. (Docket no. 19). Specifically, plaintiff argues that the ALJ was required to specifically address each factor set forth under Listing 6.00E2 in his analysis of whether medical improvement occurred. (*Id.* at 3).

The language in Listing 6.00E2 provides guidance to the Social Security Administration when conducting a continuing disability review. *See* 20 C.F.R. § 404, Subpart P, App. 1. After the twelve month presumption of disability following a kidney transplant, Listing 6.02B directs the Social Security Administration to conduct a continuing disability review. Listing 6.00E2 states that the Social Security Administration will base this evaluation on a claimant's residual impairment(s) and provides a list of medical conditions to be considered. Plaintiff argues that the ALJ erred in failing to consider these factors in deciding whether medical improvement occurred as of June 1, 2012. (Docket no. 19 at 3).

Given that the ALJ's function is to review the prior proceedings and evaluate the weight and credibility of the administrative record as a whole, the court finds that the ALJ is not required to engage in a *de novo* review of the factors set forth in Listing 6.00E2 and to specifically address each of those factors in the decision. A review of the Administrative Record reveals that the factors set forth in Listing 6.00E2 were considered in the decision making process, including the initial DHO report (AR 66–85), the examination and opinion from the consultative examiner (AR 1058–64), and the ALJ's decision (AR 16–23). The evidence submitted for consideration during the review process indicates that such a determination involved the review of plaintiff own allegations of continued diabetes and renal impairments, as

22

well as medical records from June 2012 relevant to plaintiff's kidney function and tibial plateau fracture. (AR 50–51). Plaintiff was given the opportunity to submit additional evidence and testimony throughout the process that was reviewed and considered by the decision makers. There is no question that the ALJ considered the occurrence of rejection episodes; the side effects of immunosuppressants, including corticosteroids; the frequency of any renal infections; and the presence of systemic complications such as other infections, neuropathy, or deterioration of other organ systems[10] in making his decision.

Recognizing the evidence considered during the continuing disability review, the court finds that the ALJ was not required to conduct a *de novo* evaluation of the factors in Listing 6.00E2 and specifically address each of those factors in his decision. Moreover, the court finds that the testimony and evidence considered by the ALJ included the factors contained in Listing 6.00E2 and they were properly considered by the ALJ in making his determination. Any failure to specifically address each factor in the decision is harmless error.

## V. CONCLUSION

Based on the foregoing analysis, the court finds that the Commissioner's final decision rendered on May 3, 2013 denying benefits for the period June 1, 2012 through the date of the decision, is supported by substantial evidence and that the proper legal standards were applied in evaluating that evidence. Accordingly, plaintiff's motion for summary judgment (Docket no. 8) is denied; the Commissioner's motion for summary judgment (Docket no. 13) is granted; and the final decision of the Commissioner is affirmed.

---

[10] The only medical condition that may not have been addressed directly by the ALJ concerning the deterioration of other organ systems is a mention of "severe left ventricular hypertrophy and grade 1 diastolic dysfunction" in a June 3, 2011 echocardiogram report. (AR 556–57). This report also indicates there were no significant valvular abnormalities and there was mild pulmonary hypertension. (*Id.*). The lack of any record of follow up treatment for the left ventricular hypertrophy by any of plaintiff's treating physicians indicates that this was not a major concern. This condition is not uncommon in patients with hypertension and plaintiff's hypertension was addressed by the ALJ. (AR 18–19).

Entered this 16th day of March, 2015.

_____/s/_____
John F. Anderson
United States Magistrate Judge

John F. Anderson
United States Magistrate Judge

Alexandria, Virginia

24